**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tony Begay,<br><br>           Plaintiff,<br><br>v.<br><br>Office of Navajo and Hopi Indian Relocation,<br><br>           Defendant. | No. CV-24-08085-PCT-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff Tony Begay's Motion for Summary Judgment. (Doc. 13). Defendant Office of Navajo and Hopi Indian Relocation ("ONHIR") filed a Response and Cross-Motion for Summary Judgment. (Doc. 15). Plaintiff filed a Reply on his own motion, which also operates as his response to ONHIR's Cross-Motion. (Doc. 19). Finally, ONHIR filed a Reply on its Cross-Motion for Summary Judgment. (Doc. 20). The parties did not request oral argument. The Court now rules.

**I.     BACKGROUND**

Plaintiff seeks judicial review of an administrative decision by ONHIR denying him relocation benefits under the Navajo-Hopi Settlement Act. Pub. L. No. 93-531, 88 Stat. 1712 (1974) (the "Settlement Act").

   **A. The Settlement Act**

The Settlement Act divided land that was jointly used by the Navajo Nation and Hopi Tribe into two areas: (1) the Hopi Partitioned Lands ("HPL"); and (2) the Navajo Partitioned Lands ("NPL"). *Clinton v. Babbitt*, 180 F.3d 1081, 1084 (9th Cir. 1999). The

Settlement Act also created a federal agency—now known as ONHIR—to provide services and benefits to relocate individuals who resided on land allocated to the other tribe. *Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121–22 (9th Cir. 1989). To be eligible for relocation benefits under the Settlement Act, a Navajo applicant must prove that: (1) he was a legal resident of the HPL on December 22, 1974, and (2) he continued to be a resident of the HPL when he became a "head of household." *See* 25 C.F.R. § 700.147(a), §§ 700.69(a)(2), (c); *see also Begay v. Off. of Navajo and Hopi Indian Relocation*, No. CV-20-08102-PCT-SMB, 2021 WL 4247919, at *1 (D. Ariz. Sept. 17, 2021), *aff'd*, No. 21-16937, 2022 WL 17038707 (9th Cir. Nov. 17, 2022). The applicant bears the burden of proving legal residence and head of household status. 25 C.F.R. § 700.147(b).

### B. Facts and Procedural History

Plaintiff is an enrolled member of the Navajo Nation and applied for relocation benefits on August 30, 2010. (Doc. 10-1 at 25–29). ONHIR informed Plaintiff that his application had been denied on November 28, 2012. (Doc. 10-1 at 61). ONHIR concluded that Plaintiff failed to meet the head of household requirement because: (1) he stated that he relocated from the HPL to Tuba City in 1976, and (2) he did not become a head of household until 1977. (Doc. 10-1 at 61). Plaintiff appealed ONHIR's denial and the appeal was argued before an Independent Hearing Officer ("IHO") on September 8, 2017. (Doc. 10-1 at 65, 181).

At the hearing, ONHIR did not dispute that Plaintiff was a resident of the HPL on December 22, 1974. (Doc. 10-1 at 100); 25 C.F.R. § 700.147(a) (first eligibility criteria to obtain relocation benefits). ONHIR also stipulated that Plaintiff became a head of household in 1977. (Doc. 10-1 at 100, 194). ONHIR's counsel noted that the key issue on appeal was whether Plaintiff was a resident of the HPL at the time he attained head of household status. (Doc. 10-1 at 100). Plaintiff, Tully Begay (Plaintiff's brother), Marlene Begay (Plaintiff's sister), and Andy Van (Plaintiff's cousin) all testified on Plaintiff's behalf. (Doc. 10-1 at 101–41). ONHIR did not present any witnesses. (Doc. 10-1 at 142).

1.  Plaintiff's Testimony

Plaintiff was born in June of 1959. (Doc. 10-1 at 101). Although Plaintiff was born in Tuba City, his family lived in Teasyahto on an HPL homesite. (Doc. 10-1 at 101–02). In addition to the Teasyahto homesite, Plaintiff's family "built a sort of small square house" in Tuba City. (Doc. 10-1 at 103). They stayed there during the week for Plaintiff's father's work, and for the kids' schooling. (Doc. 10-1 at 104). The family returned to Teasyahto on the weekends and also spent their summers there. (Doc. 10-1 at 104). During the summers, Plaintiff helped take care of the family's livestock and assisted his grandfather (a Medicine Man) with ceremonies. (Doc. 10-1 at 104).

Plaintiff stopped attending high school in 1974 or 1975, and went to Roswell, New Mexico in 1975 to obtain his GED. (Doc. 10-1 at 104, 106–107). After obtaining his GED certificate in 1976, Plaintiff began working for Navajo Engineer Construction Authority ("NECA") in March or April of 1977. (Doc. 10-1 at 107; Doc. 13 at 8; Doc. 14 at 4). He was based in Cameron, Arizona, and lived in a trailer provided by NECA. (Doc. 10-1 at 107–08). Plaintiff testified that on the weekends, he would "sometime[s] go back to . . . Teasyahto." (Doc. 10-1 at 108). Plaintiff explained that when he did return to the HPL, he helped his grandfather perform ceremonies and took care of the family's livestock. (Doc. 10-1 at 108–09). Plaintiff testified that the family sold off their livestock at some point, but did not remember the exact date or year. (Doc. 10-1 at 109–10). The IHO asked Plaintiff if the livestock was sold "before or after [he] went to Roswell [in 1975]" and he answered, "I think, sort of in that area." (Doc. 10-1 at 110).

After counsel finished questioning Plaintiff, the IHO asked Plaintiff what he meant when he said he "sometimes" went back to Teasyahto from the time he started working for NECA in 1977. (Doc. 10-1 at 117). Plaintiff answered that "sometimes" meant "when [he] had nothing to do or go to town or just go back out there." (Doc. 10-1 at 117).

2.  Tully Begay's Testimony

Tully Begay testified that he attended public school in Tuba City until 1978, before transferring to a high school in Utah. (Doc. 10-1 at 119). While in school, Tully stayed

- 3 -

with his aunt during the week and returned home to Teasyahto on the weekends. (Doc. 10-1 at 119). Tully testified that Plaintiff dropped out of school in 1976, began working for NECA in 1977, and was working for NECA in 1978 when Tully left for Utah. (Doc. 10-1 at 119–20). Tully testified that, after Plaintiff dropped out of school, Tully would see him in Teasyahto on the weekends because that was their parents' primary residence. (Doc. 10-1 at 120). Tully explained that in the mid-1970s, he and Plaintiff tended to livestock and helped their grandfather "with the singalongs." (Doc. 10-1 at 120). He further testified that they "were always there [in Teasyahto] on the weekends" performing various chores. (Doc. 10-1 at 122).

### 3. Marlene Begay's Testimony

Marlene Begay testified that she attended public school until 1978 before dropping out. (Doc. 10-1 at 129). Plaintiff's counsel asked Marlene if she "recall[ed] [Plaintiff] being out at Teasyahto on the weekends" "up until [1978], in the 1970s." (Doc. 10-1 at 129). Marlene answered, "Yes[,] he was." (Doc. 10-1 at 129). She also recalled Plaintiff being at Teasyahto in the summers of 1974, 1975, and 1976. (Doc. 10-1 at 130). Marlene testified that Plaintiff helped haul water, haul wood, and care for the livestock. (Doc. 10-1 at 130).

### 4. Andy Van's Testimony

Andy Van is Plaintiff's cousin by blood, but he referred to Plaintiff as his brother and testified that they grew up together. (Doc. 10-1 at 135–36). Van testified that he dropped out of school in 1976 and "stayed around and helped [his] grandfather" perform religious ceremonies with Plaintiff and Tully Begay. (Doc. 10-1 at 137). Van stated that he and Plaintiff herded sheep together "probably to the '80s" before Van "went out to work." (Doc. 10-1 at 137). Van stated that Plaintiff's job with NECA was located in Tuba City and that he traveled back and forth between Tuba City and Teasyahto because Plaintiff's family "didn't have no place" in Tuba City. (Doc. 10-1 at 137–38). But Van later testified that they "had a little shack [in Tuba City], yeah, just to stay in." (Doc. 10-1 at 140). When asked whether Plaintiff could have worked for NECA in Cameron, Arizona, instead of Tuba City, Van answered "I never did follow his work so I don't know." (Doc. 10-1 at

140).

### 5. IHO's Decision

On April 10, 2018, the IHO issued his decision denying Plaintiff's appeal and affirming ONHIR's denial of relocation benefits. (Doc. 10-1 at 180–99). Regarding the witnesses, the IHO determined that Plaintiff's testimony "about his education, GED, and employment [was] credible." (Doc. 10-1 at 187). The IHO further found that Plaintiff's testimony about his "return visits to Teasyahto from the time he became employed in March 1977 and thereafter as only being 'sometimes' ('when I had nothing to do') is credible testimony about the frequency of his visitation there." (Doc. 10-1 at 187). Regarding the other witnesses, the IHO determined that: (1) Tully Begay's testimony had "limited credibility"; (2) Marlene Begay's testimony had "no evidentiary value" because she did not define Plaintiff's return visits to Teasyahto "in terms of years or frequency"; and (3) Andy Van's testimony regarding Plaintiff's whereabouts from 1976 to 1977 was not credible. (Doc. 10-1 at 187–88).

The IHO found that Plaintiff's "decreased frequency of visitation to Teasy[ahto] in 1976 [was] consistent with his own statements that the family moved to Tuba City in 1976 and [was] consistent with his own testimony that the family sold off most or all of their livestock around that time, diminishing the need for visitation to the site." (Doc. 10-1 at 197). He found Plaintiff's own testimony that he only visited Teasyahto "sometimes" after starting work with NECA in 1977 was "the best evidence in this appeal of the significance of his contacts with [Teasyahto]." (Doc. 10-1 at 197).

The IHO ultimately concluded Plaintiff was not entitled to relocation benefits because he was not a resident of the HPL when he obtained head of household status in 1977. (Doc. 10-1 at 196). ONHIR adopted the IHO's decision as final on May 9, 2018. (Doc. 10-1 at 201). Plaintiff now appeals ONHIR's decision.

## II.     STANDARD OF REVIEW

The Administrative Procedure Act ("APA") governs judicial review of agency decisions under the Settlement Act. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir.

1995). Unlike summary judgment in an original district court proceeding, the function of the Court when reviewing an administrative proceeding "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Courts reviewing agency decisions may "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Hopi Tribe*, 46 F.3d at 914. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Hopi Tribe*, 46 F.3d at 914 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under this standard, the Court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained [its] decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency decision is arbitrary and capricious only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43.

"Substantial evidence is more than a mere scintilla, but less than a preponderance," *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995), and requires only "such relevant evidence as a reasonable mind might accept as adequate," *Info. Providers' Coal. for Def. of the First Amend. v. FCC*, 928 F.2d 866, 870 (9th Cir. 1991) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reaching his conclusions, the IHO "is entitled to draw inferences logically flowing from the evidence." *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). "Where evidence is susceptible of more than one rational interpretation," the Court must uphold the agency's decision. *Id.*

### III. DISCUSSION

Plaintiff argues that the IHO's decision must be overturned because: (1) the IHO

arbitrarily discredited the testimony of Tully Begay, Marlene Begay, and Andy Van; and (2) the IHO's determination that Plaintiff was not an HPL resident at the time he attained head-of-household status was not based on substantial evidence. (Doc. 13 at 5, 13, 16). Defendant argues that Plaintiff failed to meet his burden of establishing that he was a resident of the HPL when he became a head of household in 1977. (Doc. 15 at 11).

### A. Credibility Findings

Plaintiff argues that the IHO's credibility findings "reveal an outcome determinative decision" because the IHO only found Plaintiff credible without reservation, but arbitrarily discredited the testimony of the three other witnesses that testified on his behalf. (Doc. 13 at 5). Plaintiff thus reasons that the IHO's credibility findings were not based on substantial evidence. (Doc. 13 at 5).

"Generally, 'questions of credibility and resolution of conflicts in the testimony are functions solely' for the agency." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). The Court affords an IHO's witness credibility determination great deference because of their unique ability to observe the testimony at the hearing. *Begay*, 2021 WL 4247919, at *3 (citing *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1395 (9th Cir. 1985)). The Ninth Circuit has recognized that the IHO alone is "in a position to observe a[] [witness's] tone and demeanor[] [and] explore inconsistences in testimony" and is "uniquely qualified to decide whether a[] [witness's] testimony has about it the ring of truth." *See Sarvia-Quintanilla*, 767 F.2d at 1395.

"When the decision of an [IHO] rests on a negative credibility evaluation, the [IHO] must make findings on the record and must support those findings by pointing to substantial evidence on the record." *Ceguerra v. Sec'y of Health & Hum. Servs.*, 933 F.2d 735, 738 (9th Cir. 1991). This Court will affirm the IHO's credibility findings unless the IHO fails to provide "specific and cogent reasons supported by substantial evidence." *Begay*, 2021 WL 4247919, at *3 (citing *De Valle v. INS*, 901 F.2d 787, 792 (9th Cir. 1990)).

1. Plaintiff

Plaintiff testified that after he began working for NECA in 1977, he only visited Teasyahto "sometimes" "when [he] had nothing to do." (Doc. 10-1 at 117). The IHO found Plaintiff's testimony was credible regarding the frequency of his visitation there during that period. (Doc. 10-1 at 187).

Plaintiff argues that the "quoted phrases do not reflect the totality of references" in his testimony to his contacts with his HPL homesite. (Doc. 13 at 6–8). But none of the Plaintiff's other testimony quantifies his visitation to the HPL during the period of time relevant to Plaintiff's appeal—the period after he started work for NECA in 1977. Plaintiff's testimony about his upbringing and education are *pre*-1977 events do not help determine his residency at the time he became a head of household. And when the IHO gave Plaintiff the opportunity to clarify the extent of his contacts with the HPL in 1977 specifically, he failed to do so. Instead of quantifying his visits back to the HPL, or discussing what Plaintiff did there, he merely testified that he returned to the HPL sometimes, when he "had nothing to do." (Doc. 10-1 at 117). The IHO permissibly credited the limited testimony Plaintiff provided regarding his HPL contacts in 1977. Because IHOs are afforded considerable deference due to their unique ability to observe the witnesses in person and ascertain whether the testimony "has about it the ring of truth," the Court finds no error in the IHO's credibility determination. *Sarvia-Quintanilla*, 767 F.2d at 1395.

The IHO made negative credibility determinations with respect to Tully and Marlene Begay, and Andy Van. The Court addresses each in turn.

2. Tully Begay

Regarding Tully Begay, the IHO made the following findings:

> Applicant's younger brother testified about his own education and his own return visits to Teasy[ahto]. Tully Begay's testimony was confusing about the return visitation to Teasy[ahto] and has limited credibility. In particular, to the extent it contradicts applicant's testimony, applicant's own testimony is more credible than Tully Begay's as to applicant's whereabouts and visitation to Teasy[ahto] more than forty years ago.

(Doc. 10-1 at 187). Plaintiff argues that the IHO does not explain why Tully's credibility

- 8 -

1    was "limited," or how Tully's testimony contradicted Plaintiff's. (Doc. 13 at 9).

2          Although the IHO did not fully elaborate on his credibility determinations in the
3    "Credibility Findings" section of his decision, the IHO explained why he discredited
4    Tully's testimony in the body of the decision. *Begay*, 2021 WL 4247919, at *4 ("The IHO
5    may set forward [reasons for rejecting testimony as uncredible] either in the formal
6    credibility determination or in the body of the decision.").

7          The IHO noted that Plaintiff and Tully offered conflicting testimony about whether
8    their father was present at Teasyahto on the weekends in 1976. (Doc 10-1 at 198). Plaintiff
9    testified that he drove the family to the homesite to get his mother away from his father,
10   who had a drinking problem at the time. (Doc. 10-1 at 115–16). Tully testified that his
11   father would take the family to Teasyahto and that their mother was with their father "the
12   majority of the time." (Doc. 10-1 at 124–26). Tully also testified that after Plaintiff started
13   working for NECA, he saw Plaintiff at Teasyahto because the two were "always there on
14   the weekends" performing various chores. (Doc. 10-1 at 121–22). This testimony conflicts
15   with Plaintiff's own account of his visitation to Teasyahto during the same time. Plaintiff
16   indicated he only returned to the homesite "sometimes" "when [he] had nothing to do."
17   (Doc. 10-1 at 117).

18         The fact that Tully's testimony contradicted Plaintiff's is a specific and cogent
19   reason to limit his credibility, and the Court finds no error. *Begay*, 2021 WL 4247919, at
20   *4 (an adverse credibility determination may rest upon the "existence of contrary evidence
21   in the record").

22           3.  <u>Marlene Begay</u>

23         The IHO found that Marlene Begay's testimony "ha[d] no evidentiary value in
24   determining [Plaintiff's] appeal" because she did not quantify Plaintiff's return visits to
25   Teasyahto in terms of years or frequency. (Doc. 10-1 at 188). Plaintiff argues that
26   Marlene's testimony *did* have evidentiary value because she "testified to [Plaintiff] being
27   present on weekends in the 1970s." (Doc. 13 at 10). But Marlene's testimony generally
28   affirming that she saw Plaintiff at Teasyahto on the weekends "in the 1970s," (Doc. 10-1

at 129), does not shed light on the frequency of Plaintiff's visits to Teasyahto in 1977. Thus, the Court agrees with the IHO that this vague testimony is unhelpful in determining the central question of Plaintiff's appeal: whether he was an HPL resident in 1977 when he became a head of household. *See Yazzie v. Off. of Navajo and Hopi Indian Relocation*, No. CV-23-08510-PCT-JAT, 2024 WL 3345192, at *5 (D. Ariz. July 8, 2024) (witnesses' failure to quantify the plaintiff's visitation to the HPL during the operative period was a specific and cogent reason to "lend limited credibility to [their] testimony").

### 4. Andy Van

Finally, the IHO made the following findings regarding Andy Van:

> Andy [V]an's testimony contradicted applicant's and applicant's siblings' testimony insofar as Andy [V]an claimed applicant's family had no place of their own to live in Tuba City . . . and further contradicted applicant's testimony as to when the family sold its livestock that had been at Teasy[ahto], claiming it was later than applicant stated. Andy [V]an's testimony as to the frequency or quality of the visits he claims applicant made to Teasy[ahto] is very general and further contradicted applicant's testimony by assert[ing] applicant's work for NECA "was in Tuba." Andy [V]an's recollections of his cousin's whereabouts from 1976 to 1977 (over forty years ago) is not credible.

(Doc. 10-1 at 188). Plaintiff claims that he and Van merely had a "difference in recall" as to when Plaintiff's family sold their livestock, and that Van's "error that [Plaintiff] was based in Tuba rather than Cameron is not such an error to render [his] testimony not credible." (Doc. 13 at 12).

The Court finds that the IHO articulated specific and cogent reasons for discrediting Van's testimony, which are supported by the record. Van initially testified that Plaintiff and his family did not have a Tuba City residence, but when questioned on redirect, he admitted the family stayed "in a little shack there." (Doc. 10-1 at 138, 140). Van claimed that Plaintiff's family still owned livestock in 1976 and that the two herded sheep together until the 80s, but Plaintiff indicated that the livestock was sold around 1975. (Doc. 10-1 at 137, 110). Van did not specifically testify to Plaintiff's contacts with the HPL in 1977, and he incorrectly stated that Plaintiff worked for NECA in Tuba City rather than in Cameron. (Doc. 10-1 at 137).

Because the IHO reasonably discredited Van due to his inconsistent and inaccurate testimony, the Court will not disturb this credibility finding. *Manygoats v. Off. of Navajo*, No. CV-22-08028-PCT-DLR, 2024 WL 1209947, at *3 (D. Ariz. Mar. 21, 2024) ("In assessing credibility, an IHO may 'adequately find a lack of credibility based on internal inconsistencies in a witness's testimony' or 'the totality of the record.'").

### B. Plaintiff's Residence in 1977

As noted, it is undisputed that Plaintiff was an HPL resident on December 22, 1974, and that Plaintiff became a head of household in 1977. Plaintiff's appeal rests on his claim that that he was still a resident of the HPL in 1977 by virtue of his visits to Teasyahto during that year. The IHO found he was not an HPL resident at that time, and thus was not entitled to relocation benefits. The IHO reasoned that:

> The lack of specificity, the lack of frequency, the absence of any testimony about what [Plaintiff] did while at Teasy[ahto] after June 1976 when he obtained his GED . . . and the indefinite description of "sometimes" as the catch-all for his contact with Teasy[ahto] after he began working [at NECA in 1977] is insufficient to determine that [Plaintiff] has met his burden of proof showing legal residence on HPL after he can be considered to have become a head of household.

(Doc. 10-1 at 197). The IHO's determination that the Plaintiff was not a resident of the HPL when he obtained head of household status was based on substantial evidence.

The term "residency" for purposes of the Settlement Act is defined by its legal meaning, "which requires an examination of a person's intent to reside combined with manifestations of that intent." 49 Fed. Reg. 22,277–78 (eliminating "substantial and recurring contacts" standard and adopting "intent and manifestations of intent" standard for assessing residency); *see also Charles v. Office of Navajo*, 774 F. App'x 389, 390 (9th Cir. 2019) (unpublished). "[I]n assessing an applicant['s] manifestations of intent to maintain legal residence in the partitioned lands," ONHIR looks to multiple factors, including: ownership of livestock, ownership of improvements, grazing permits, livestock sales receipts, homesite leases, public health records, school records, military records, employment records, mailing address records, banking records, driver's license records, tribal and county voting records, home ownership or rental off the disputed area, Social

- 11 -

Security Administration records, Joint Use Area Roster, and other relevant data. 49 Fed. Reg. at 22,278.

Plaintiff argues that both testimony from the hearing and documentary evidence in the record establish he was an HPL resident in 1977.

### 1. Hearing Testimony

Plaintiff argues the hearing testimony "shows he maintained his frequent and substantial contacts with Teasyahto when he began working for NECA and through the time he became head-of-household." (Doc. 13 at 15). He criticizes the IHO's decision to rely on his "use of a few casual, non-specific phrases to support the determination that his contacts with Teasy[ahto] were infrequent and non-substantive." (Doc. 13 at 15). Plaintiff contends that his these "casual, non-specific" phrases do not represent the entirety of his testimony and do not justify dismissing the other witness testimony that confirm Plaintiff's "substantive contacts" with Teasyahto. (Doc. 13 at 15). ONHIR counters that Plaintiff's three witnesses did not specifically quantify his visits to the HPL during 1977, and that the IHO's decision to credit Plaintiff's "non-specific" phrases was based on the totality of the record, including: (1) Plaintiff's relocation application, (2) other hearing testimony, and (3) Plaintiff's full-time employment with NECA in March 1977. (Doc. 15 at 15).

Plaintiff essentially asks this Court to reweigh the evidence. But, as previously discussed, the IHO properly credited Plaintiff's testimony and discredited the other witnesses' testimony. Because the evidence is susceptible to more than one rational interpretation, the Court finds no basis to overturn the IHO's decision based on the hearing testimony.

### 2. Documentary Evidence

Plaintiff next argues that various documents in the record prove he was an HPL resident in 1977. Plaintiff's reply points the Court to five documents: (1) Jessie Begay, Sr.'s (Plaintiff's father) Head of Household Questionnaire, (2) a certification form signed by Mary Begay (Plaintiff's mother), (3) a Certification of Residency form signed by Mary Begay's sister, cousin, and grandpa, (4) a memorandum discussing the construction of

Mary Begay's relocation home, and (5) Jessie Begay Sr.'s Criteria Verification form. (Doc. 19 at 8–9; Doc. 10-1 at 3–5; Doc. 10-1 at 7–8, Doc. 10-1 at 12, Doc. 10-1 at 13–20). These documents relate to Plaintiffs' *parents'* HPL residency status and various forms connected to *their* applications for relocation benefits. Plaintiff argues that these documents establish that the Begay family were HPL residents in 1977. (Doc. 19 at 8).

Plaintiff contends that he had derivative residency through his mother during the operative period because she was an HPL resident when Plaintiff turned 18 on June 28, 1977. (Doc. 13 at 17). Plaintiff's derivative residency argument fails because he became a head of household before he turned 18 on June 28, 1977, making his "pre-emancipation residency . . . irrelevant." *See Bedoni*, 878 F.2d at 1123 (once a minor becomes a head of household, he is considered emancipated and thus eligible to apply for relocation benefits "in his own right").

ONHIR policy considers earnings of $1,300 or more per year as prima facie evidence that an applicant "could be self-supporting for relocation purposes." (Doc. 10-1 at 194); *see Tohannie v. Off. of Navajo and Hopi Indian Relocation*, No. CV-21-08272-PCT-ROS, 2022 WL 17987268, at *3 (D. Ariz. Dec. 29, 2022) (ONHIR and the federal courts have viewed "incomes more than $1,300 . . . as establishing the individual was [a] self-supporting" head of household). Plaintiff began working at NECA in March or April of 1977 and earned $4,535 that year. (Doc. 10-1 at 36). At this time, Plaintiff lived separately from his parents in a trailer NECA provided him. (Doc. 10-1 at 107–08). Based on Plaintiff's start date, it is clear that he earned over $1,300 before he turned 18, thus making him a head of household.[1] *Yazzie v. Off. of Navajo and Hopi Indian Relocation*, No. 22-16124, 2024 WL 1904560, at *3 (9th Cir. May 1, 2024) (applicant "established a prima facie case that he was a head of household" by earning more than $1,300 within a

---

[1] Plaintiff all but conceded this fact in both his summary judgment motion and reply. (Doc. 13 at 17) ("Mr. Begay turned 18 on June 28, 1977, meaning he earned the requisite amount to establish head-of-household status very close to the date he reached the age of majority."); (Doc. 19 at 11–12) ("Plaintiff estimates that based upon his documented 1977 earnings and the commencement of his employment sometime in March, 1977, that he would have earned the requisite amount to achieve head-of-household status close to his 18th birthday.").

year).

Plaintiff attempts to rely on his parents' residence in 1977 even though he became a head of household that year, independent from his parents. But Plaintiff cannot sidestep his head of household status by claiming derivative residency. The IHO's decision states that "[i]t is ONHIR's practice and history to consider individuals who become heads of household prior to reaching the age of majority to be emancipated minors on the date they become heads of household, regardless of whether formal court process emancipated them."[2] (Doc. 10-1 at 192). Accordingly, "ONHIR does not recognize heads of household under the age of eighteen as derivatively possessing their parents' residency as they are considered to have established their own legal residency upon their emancipation." (Doc. 10-1 at 192); *see also Bedoni*, 878 F.2d at 1123 (finding plaintiff's derivative residency argument meritless because his "pre-emancipation residency [was] irrelevant" and affirming the denial of benefits because plaintiff, "though a head of household, was not a resident after his emancipation").

Accordingly, the five documents Plaintiff cites pertaining to his parents' residency status are irrelevant to determining *his* residency status as an emancipated head of household.

### 3. Conclusion

The record evidence reasonably supports the IHO's determination that Plaintiff's contacts with HPL were insufficient to prove he was an HPL resident during the operative

---

[2] Plaintiff's reply argues that a recent Ninth Circuit "ONHIR [relocation] benefits decision arrives at a contrary conclusion." (Doc. 19 at 11) (citing *Yazzie*, 2024 WL 1904560, at *2). Plaintiff quotes the following language from *Yazzie*: "[T]he IHO acknowledged that, even though Yazzie studied away from home while in 10th and 11th grades, Yazzie's 'derivative legal residence' at White Cone would continue to exist at least 'until he became 18 years old.' Moreover, once a child turns 18, that child's 'legal residence or domicile' continues "until a new one is acquired." (Doc. 19 at 11) (quoting *Yazzie*, 2024 WL 1904560, at *2) (internal quotations omitted).

Plaintiff offers no explanation or analysis as to why *Yazzie*'s holding is inconsistent with ONHIR's longstanding practice to treat "individuals who become heads of household prior to reaching the age of majority . . . [as] emancipated minors on the date they become heads of household." (Doc. 10-1 at 192). Indeed, Yazzie turned 18 on May 8, 1978, and obtained head of household status through his earnings from "the summer and fall of 1978." Because the prima facie evidence established Yazzie as a head of household *after* his 18th birthday, the decision is factually distinguishable from the present case.

- 14 -

period.

### C. "Undated Memo"

Plaintiff directs the Court to an "undated memo" in the administrative record which states: "Applicant HPL residency OK up to 06/28/1977 and I believe he was still HPL resident when he became H/H [head of household] in 1977." (Doc. 13 at 16, quoting Doc. 10-1 at 204). The memo also states that Plaintiff's father "left [the] HPL before 1980" and received relocation benefits in 1992, and that Plaintiff's mother "left [the] HPL [in] 1982" and received relocation benefits in 1984. (Doc. 10-1 at 204). Plaintiff argues the undated memo proves his derivative residency because his mother's HPL residency "continued well past" his 18th birthday on June 28, 1977. (Doc. 13 at 16–17; *see also* Doc. 19 at 10–12). For the reasons discussed above, Plaintiff's derivative residency argument fails. Accordingly, the Court will disregard Plaintiff's reliance on the undated memo insofar as it relates to his claim of derivative residency.

The question at the heart of Plaintiff's appeal is whether *he*, by virtue of his own connections to the HPL, was a resident when he obtained head of household status in 1977. The only sentence in the undated memo related to this inquiry states: "Applicant HPL residency is OK up to 06/28/1977 and I believe he was still HPL resident when he became H/H in 1977." (Doc. 10-1 at 204).

ONHIR argues Plaintiff waived his ability to reference the undated memo because he did not address it at the agency level. (Doc. 15 at 13). ONHIR further argues that the document's probative value is "questionable" because it is undated and does not list an author. (Doc. 15 at 17) (citing *Bahe v. Off. of Navajo*, No. CV-17-08016-PCT-DLR, 2017 WL 6618872, at *2 (D. Ariz. Dec. 28, 2017) ("Where . . . a petitioner in an administrative proceeding fails to raise an issue before the administrative tribunal, the issue cannot be raised on appeal from that tribunal.")). In response, Plaintiff argues there is a "distinction between presenting a legal issue for the first time on appeal" and presenting an item of evidence *in support of* an issue raised at the agency level. (Doc. 19 at 9–10). Because the memo supports an issue addressed in the underlying proceedings—i.e., Plaintiff's

residency status when he became a head of household—Plaintiff contends it should be considered. (Doc. 19 at 9-10). ONHIR replied that this argument is a "distinction without a difference," asserting that Plaintiff, by failing to "include the undated memo as an exhibit to his post-hearing brief, or introduce it at the hearing," "did not give the IHO an opportunity to address it" and has thus waived the ability to rely on the document in this appeal. (Doc. 20 at 7).

Plaintiff does not cite any relevant caselaw to support his position that offering a potentially "new" item of evidence on appeal is functionally different from arguing a new legal issue for the first time on appeal. The Ninth Circuit has noted that "as a Court reviewing a final order of an administrative agency[,] we are not permitted to consider evidence that was not before" the agency. *Gomez-Vigil v. INS*, 990 F.2d 1111, 1113 (9th Cir. 1993). Indeed, as a general rule, courts reviewing an agency decision "typically focus[] on the administrative record in existence at the time of the decision," and exclude from consideration "any part of the record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (quoting *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996)). However, reviewing courts may admit extra-record evidence if: "(1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'" *Id.*

The undated memo at issue here is problematic because it is unclear whether it was part of the administrative record "in existence *at the time of the [IHO's] decision*," or is more aptly categorized as extra-record evidence presented for the first time to this reviewing Court.[3] *Id.* These questions are central to determining whether the Court can

---

[3] The Court acknowledges that the undated memo is not extra-record evidence in the traditional sense—indeed, it is undisputed that administrative record technically encompasses this document. (Doc. 10-1 at 204). However, there is a question as to whether the memo *functions* as extra-record evidence for purposes of this appeal, given the confusion as to whether (a) the document was part of the administrative record at the time the IHO authored his decision, or (b) it is presented for the first time to this Court.

- 16 -

consider the memo in its review of the IHO's decision. Plaintiff concedes "it is not certain if the ONHIR 'undated memo' in question [was] one of the documents introduced at [the] hearing."[4] (Doc. 19 at 10). Beyond this concession, the parties make no attempt to clarify the document's origin, the foundation (if any) supporting the document, or the timeline of its submission to the administrative record. Based on the available record, the Court makes the following findings and reaches the following conclusions regarding the undated memo.

The administrative record is organized chronologically and ranges from documents dated as early as December 7, 1977, to as late as May 9, 2018. (Doc. 10-1 at 1-2). The record logically follows the timeline of Plaintiff's application for relocation benefits and his subsequent appeal—ONHIR's letter denying Plaintiff's request for relocation benefits is followed by Plaintiff's appeal letter, the hearing transcript, the parties' post-hearing briefs, the IHO's decision, and so on. (Doc. 10-1 at 1-2). The only document in the entirety of the administrative record that is undated and has no logical place in the sequence of documents is the memo upon which Plaintiff relies. It is listed on the very last page of the record, *after* the IHO's decision and ONHIR's final agency decision. (Doc. 10-1 at 204). It is merely titled: "Undated . . . Tony C. Begay analysis," (Doc. 10-1 at 204), and is devoid of any detail regarding the document's author, the date it was written, or the date it was added to the record. And the singular sentence in the undated memo relevant to Plaintiff's appeal contains no analysis as to *why* the unknown author believed Plaintiff was an HPL resident when he obtained head of household status.

The Court's review of the record reveals that Plaintiff did not reference the undated memo during the hearing, or in his post-hearing brief. And while the IHO's decision referenced other documents in the record (including Plaintiff's application for benefits, his Social Security statements, documents from his parents' relocation files, and the hearing transcript), it did not cite to the undated memo. (Doc. 10-1 at 181–99). It appears that both the parties and the IHO were unaware of the document's existence during the underlying proceedings. Indeed, there is no evidence that the document was part of the record at the

---

[4] The Court's independent review of the hearing transcript reveals that the undated memo was not admitted, discussed, or otherwise referenced at the hearing.

time the IHO rendered his decision. If that is the case, and the memo was added to the record after the decision had been issued, then this Court cannot independently review it for the first time on appeal. *Lands Council*, 395 F.3d at 1029 (limiting a reviewing court's focus to the administrative record *existing at the time of the agency's decision*).

However, there is still the possibility that the memo *was* part of the administrative record at the time the IHO authored his decision. In this instance, two options exist: either (1) the IHO reviewed the document and still denied Plaintiff benefits (thus rejecting the document's contents), or (2) the IHO, despite having the memo available in the administrative record for his consideration, did not review it. The Court addresses each possibility in turn.

### 1. Option 1: IHO Reviewed and Rejected the Undated Memo

If the IHO reviewed and rejected the undated memo, this Court cannot say that doing so was arbitrary and capricious or an abuse of discretion. The memo's author is unknown and the document is undated. Beyond these critical defects, the memo provides no foundation or support for the mystery author's conclusory opinion that Plaintiff remained an HPL resident when he obtained head of household status. And the memo does not contain any information about Plaintiff's intent to reside on the HPL or constitute a "manifestation of [his] intent" to reside there. 49 Fed. Reg. 22,277–78 (listing factors courts consider in assessing an applicant's manifestations of intent to maintain legal residence on partitioned lands). The probative value of the undated memo is shaky at best—entirely lacking at worst—and does not provide a sufficient basis to reverse the IHO's decision or to award Plaintiff relocation benefits, as he requests.

### 2. Option 2: IHO Failed to Review the Undated Memo

It is possible that the memo was part of the administrative record when the IHO reviewed it, and that he failed to consider it. Although Plaintiff has not raised this argument, the Court has considered whether, given this possibility, remand for further proceedings and investigation into the memo's contents is appropriate.

Remand to the agency for additional investigation or explanation is only appropriate

"if the record before the agency does not support the agency action." *Stago v. Off. of Navajo and Hopi Indian Relocation*, 562 F. Supp. 3d 95, 106 (D. Ariz. 2021) (quoting *Begay v. Off. of Navajo & Hopi Indian Relocation*, No. CV-16-08221-PCT-DGC, 2017 WL 4297348, at *4 (D. Ariz. Sept. 28, 2017)).

The Court finds that the record supports ONHIR's decision such that remand is unnecessary. The hearing testimony and documentation in the record constitute substantial evidence that Plaintiff was not an HPL resident when he became a head of household. Further, it is unclear what would be accomplished from remanding this case for further investigation into the undated memo when, on its face, it is deficient. Whether reviewed by this Court or by the IHO, the same glaring issues remain: (1) the memo is undated, (2) it does not list an author or any other identifying information by which to determine the author, and (3) the singular opinion contained in the memo is wholly unsupported. Neither party appears to have answers to these fundamental questions. Given these evidentiary deficiencies, it is unlikely that the memo could be assigned significant—if any— evidentiary weight, let alone enough to alter the outcome of Plaintiff's relocation benefits determination. Accordingly, remanding this matter for the singular purpose of evaluating the undated memo is futile. *See de Jesus Melendez v. Gonzales*, 503 F.3d 1019, 1023 n.1 (9th Cir. 2007) (remand to the agency is not required when doing so would be futile).

### 3. Conclusion

For the reasons stated, the Court finds the undated memo provides no basis to disturb the IHO's decision or remand for additional proceedings.

## IV.   CONCLUSION

The IHO reasonably found that Plaintiff's contacts with HPL were insufficient to establish that he was a resident at the time he obtained head of household status through his employment with NECA. Under the deferential standard of review required here, the Court concludes the IHO's decision was supported by substantial evidence. Because the IHO's denial of relocation benefits was not arbitrary, capricious, or an abuse of discretion, ONHIR is entitled to summary judgment.

Accordingly,

**IT IS ORDERED** Plaintiff's Motion for Summary Judgment (Doc. 13) is **denied**.

**IT IS FURTHER ORDERED** Defendant's Cross-Motion for Summary Judgment (Doc. 15) is **granted**. Defendant's administrative decision denying Plaintiff's application for relocation benefits is, therefore, **affirmed**. The Clerk of the Court shall enter judgment in favor of the Defendant and against Plaintiff.

Dated this 23rd day of September, 2025.

James A. Teilborg
Senior United States District Judge